SHIRLEY S. ABRAHAMSON, C.J.
¶ 55. (dissenting.) The issue before the court is whether the written fee agreement between Randy Betz, the client, and Vince Megna, the attorney, transferred the client's right to statutory attorney fees to the attorney. The majority opinion, ¶ 43, purports to apply "traditional principles of contract law" to decide the issue. It does not.
¶ 56. The majority opinion interprets the text of the fee agreement in a scant three paragraphs, ¶¶ 41, 42, and 43, without any analysis, proof, authority, or resort to contract principles.
¶ 57. At ¶ 41, without any analysis, proof, authority, or use of principles of contract interpretation, the majority opinion recites the rule that an assignment depends on the assignor's intention and then pronounces in a single sentence that "no such manifestation [of the assignor's intention to transfer a right] exists in the fee agreement at issue."[1] Nothing more to analyze here.
*326 ¶ 58. At ¶ 42, without any analysis, proof, authority, or use of principles of contract interpretation, the majority opinion pronounces that because the "FEE SHIFTING" provision has "qualified statements" it "cannot be fairly characterized as a written assignment of Betz's statutory right to recover fees."
¶ 59. At ¶ 43, without any analysis, proof, authority, or use of principles of contract interpretation, the majority opinion pronounces that various parts of the fee agreement that "provide [] for a number of circumstances in which Betz might have to pay for Megna's fees or costs himself' "provide evidence that Betz did not assign his right to statutory attorney's fees to Megna in the fee agreement."
¶ 60. Rather than apply rules of contract interpretation, some of which the majority opinion dutifully recites, the majority opinion simply decrees, ipse dixit, that the language of the fee agreement does not mean what it says. This resolution cannot be correct.[2] The fee agreement unambiguously assigned Betz's right to attorney's fees to Megna.
¶ 61. This court's pronouncements about assignments extend beyond the instant case. Assignments are *327 frequently the subject of litigation in this court. This court has considered assignments in other cases and contexts, each with its own particularities due to the circumstances of the case.[3] Although each of these cases involves a slightly different fact scenario, a central question is the same — did the parties execute an effective assignment?
I
¶ 62. I apply the following principles of contract law to the instant case.
¶ 63. The Restatement (Second) of Contracts, relied upon by the majority opinion, ¶ 41, defines an assignment as follows: "An assignment is the 'manifestation of the assignor's intention to transfer' a right so that the assignee acquires the right to performance by the obligor."[4]
¶ 64. The Restatement does not require any particular formalities to be observed to make an effective assignment.[5] "No words of art are required to constitute *328 an assignment; any words that fairly indicate an intention to make the assignee owner of a claim are sufficient."[6] The assignment requires only that "the obligee manifest an intention to transfer the right to another person without further action or manifestation of intention by the obligee."[7]
¶ 65. The phrase "manifestation of intention" is a basic concept in contract formation in the Restatement (Second) of Contracts. The phrase "adopts an external or objective standard for interpreting conduct; it means the external expression of intention as distinguished from undisclosed intention."[8]
¶ 66. To determine the parties' "manifestation of intention," the courts apply other well-accepted rules of contract interpretation: "We interpret a contract to give 'reasonable meaning to each provision and without rendering any portion superfluous.' "[9] "A writing is interpreted as a whole"[10] and words "are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight."[11]
¶ 67. "Because the scope of retainer agreements varies from attorney to attorney and case to case," inquiries about the meaning of a retainer and fee *329 allocation agreement between an attorney and a client "are necessarily fact intensive."[12]
¶ 68. The meaning given to words "depends to a varying extent on the context and on the prior experience of the parties."[13] In other words, the essence of the meaning of the words of a contract is found in how a reasonable person would understand the terms, having in mind the context of the transaction. Our courts interpret contracts to give them "common sense"[14] and "realistic"[15] meaning.
¶ 69. When there is an ambiguity, the courts look to extrinsic evidence to resolve the parties' intent.[16] Extrinsic evidence can include the conduct of the parties, their negotiations before and after the execution of the documents, the acts and deeds in connection with surrounding circumstances, and their words.[17]
*330 II
¶ 70. I now apply these interpretive aids to the text of the fee agreement.
¶ 71. I have attached a true and correct copy of the fee agreement to give the full text of the agreement.
¶ 72. The text of the fee agreement at issue is not derived from a legal form book. It is written in plain English, a practice that should be commended.[18]
¶ 73. The text of the fee agreement, giving meaning to each provision read separately and to the text read as a whole, clearly manifests an intention in plain English that the attorney will look to the defendant for attorney fees in some circumstances, and to the client in other circumstances.
¶ 74. The circuit court interpreted the agreement as I do. The circuit court declared:
The fee-shifting provision addresses with whom the right to collect attorney fees vests. It transfers the authority from Betz to Attorney Megna. It provides Attorney Megna with the authority to seek attorney fees from the Defendant if Betz succeeds with his Wis. Stat. § 100.18 claim at trial or during settlement with *331 Diamond Jim's. Thus, Attorney Megna may certainly have the right to seek attorney fees in the appropriate situation.
The circuit court was correct.
¶ 75. The words of the agreement itself support this interpretation.
¶ 76. The agreement is divided into several parts, with a bold-faced, capitalized heading preceding each part. Each part of the fee agreement explains the allocation of attorney fees under a particular set of circumstances.
¶ 77. The headings are descriptive of four various circumstances under which fees are to allocated: "FEE SHIFTING," "SETTLEMENT PRIOR TO LAWSUIT," "COSTS AND EXPENSES," and "TERMINATION." The purpose of this agreement is to establish when the client pays the attorney's fees, and when the defendant pays the attorney's fees.
¶ 78. The words that manifest an intention to give the attorney the right to collect attorney's fees are in the part labeled "FEE SHIFTING." The agreement explicitly uses the words "FEE SHIFTING" and explicitly refers to the attorney fee shifting statute, Wis. Stat. § 100.18.
¶ 79. The agreement states under the heading "FEE SHIFTING" the following:
FEE SHIFTING
I understand that Sec. 100.18, Wis. Stats.,_is a fee shifting statute. This means if I win at trial or settle my case during litigation, the defendant is usually responsible for paying my attorney fees based on my attorney's hourly rate. I understand that the Law Offices of Vince Megna is accepting my case with the agreement that it will look to the defendant for pay *332 ment of attorney fees pursuant to the fee shifting provision once a lawsuit has been filed (emphasis added).
¶ 80. The "FEE SHIFTING" provision unqualifiedly states the circumstances under which the attorney will pursue the attorney fees from the defendant: In exchange for the law firm's agreement to take the case, the client and attorney agree that the attorney "will look to the defendant for payment of attorney fees pursuant to the fee shifting provision once a lawsuit has been filed" (emphasis added).
¶ 81. The "FEE SHIFTING" provision states that the defendant is usually responsible for paying the client's attorney's fees and that the attorney "will" pursue fees from the defendant, not that the attorney may or could do so. Obviously, the attorney cannot look to the defendant for statutory attorney's fees unless the client agrees that the fees belong to the attorney and not the client. By signing the agreement, the client agrees to this arrangement.
¶ 82. The language in the "FEE SHIFTING" provision states, in plain English, the basic terms of the transfer (assignment) of a statutory fee award in litigation from the client to the lawyer and meets all the requirements of an assignment:
• Who is entitled to statutory fees? The client.
• Who gets the statutory fees? The attorney.
• What attorney fees are being transferred? "[P]ayment of attorney fees pursuant to the fee-shifting statute once a lawsuit has been filed."
• Is there additional action or manifestation of intention required by the client? No.
*333 ¶ 83. The majority opinion, ¶ 42, dismisses the "FEE SHIFTING" provision as "qualified statements" that "cannot be fairly characterized as an assignment of Betz's statutory right to recover fees." Majority op., ¶ 42.[19] Notably, the majority opinion does not offer which words "qualify" the last sentence, which states that in exchange for taking the case, the attorney will pursue attorney fees from the defendant.
¶ 84. Unable to provide a qualifier for the key last sentence of the "FEE SHIFTING" provision, the majority opinion, ¶ 42, instead focuses on the word "usually" in the second sentence, which states that if there is litigation, "the defendant is usually responsible for paying my attorney fees based on my attorney's hourly rate" (emphasis added).
¶ 85. The word "usually" in the second sentence is a correct non-legalese statement of the law. A court usually holds the defendant liable for the plaintiffs attorney fees based on the attorney's hourly rate as stated in the fee agreement. But courts do not always do so.
¶ 86. The real problem the fee agreement faces in the majority opinion is that the text of the "FEE SHIFTING" provision is not in the typical formalistic assignment language the majority expects. It does not *334 use the legalese of generic boilerplate forms for assignments, nor does it use the legal jargon of "assign" or "transfer."
¶ 87. "[0]ur profession disdains plain speech."[20] Judges would probably better understand the agreement in the instant case if it were drafted in traditional legalese assignment language used in legal form guides that read something like the following:
In exchange for value received, I, _, of _[address], as assignor, assign and transfer to _, of _[address], as assignee, assignee's legal representatives and assigns, for assignee and their use and benefit, any and all... ,[21]
¶ 88. In contrast, the client probably better understands the plain English version Attorney Megna used, which states that Megna, not the client, gets statutory fees from the defendant in litigation.
¶ 89. The majority opinion ignores the rule of interpretation that no particular magic words are needed to manifest an intention to assign. Instead, the majority opinion sends a message to attorneys who represent clients in cases where fee-shifting statutes *335 apply: use legalese, not plain English. The majority opinion seems to endorse attorneys who use the legalese version of assignment, in which the client "in exchange for valuable consideration, hereby assigns and transfers the right to pursue attorney's fees, pursuant to [statute], to [attorney] of [address] and all [attorney's] legal assigns and heirs" and so forth.
¶ 90. The majority opinion ignores the rule of interpretation that requires us to give reasonable meaning to each word of the contract. What reasonable meaning does the "FEE SHIFTING" provision have if it is not an assignment of rights to legal fees in the event of a lawsuit? The majority opinion renders this language meaningless and superfluous.
¶ 91. Other provisions of the fee agreement support interpreting the "FEE SHIFTING" provision as assigning to the attorney the right to collect attorney's fees from the defendant if there is litigation. The agreement repeatedly treats the attorney, not the client, as the owner of the attorneys fees paid by the defendant and awarded under the fee shifting statute when litigation ensues. See, for example, the following:
• [the client] understand that the Law Offices of Vince Megna will charge the other side its current rates that are then charged at the time of request for payment of its fees. ["HOURLY RATE"] (Emphasis added.)
• In addition to all other fees paid to the Law Offices of Vince Megna by the other side, I agree to pay the Law Offices of Vince Megna .... ["ADDITIONAL RECOVERY"] (Emphasis added.)
• In addition to all other fees paid to the Law Offices of Vince Megna by the other side, I agree to pay the Law Offices of Vince Megna 40% of any punitive *336 damages recovered, whether through settlement or judgment. ["PUNITIVE DAMAGES"] (Emphasis added.)
• If a settlement is reached prior to a lawsuit being filed.. . the defendant may not be responsible for payment of my attorney fees. In this event, the Law Offices ... agrees to charge a flat rate attorney fee in the amount of _ [left blank] ["SETTLEMENT PRIOR TO LAWSUIT"]
¶ 92. In each instance, the agreement treats the attorney, not the client, as the holder of the right to attorney's fees paid by the defendant.
¶ 93. The fee agreement sets forth various fee allocations under differing circumstances. The majority opinion asserts that these provisions for fee allocation under circumstances other than litigation "provide evidence that Betz did not assign his right to statutory attorney's fees to Megna in the fee agreement." Majority op., ¶ 43.[22]
¶ 94. The majority does not say, and I cannot figure out, why a provision requiring Betz to pay fees or *337 costs under certain circumstances (for example, if no lawsuit were filed) means that "principles of contract law militate against finding that Betz assigned his right to statutory attorney's fees to Megna." Majority op., ¶ 43.
¶ 95. The assignment of attorney fees is thus effective under certain circumstances; the assignment does not come into play should certain other circumstances come to pass. There is nothing unusual about this arrangement.
¶ 96. I conclude, as did the circuit court, that the text of the "FEE SHIFTING" provision and the text of the agreement as a whole demonstrate a manifest intention to assign the claim to legal fees under Wis. Stat. § 100.18 to the attorney in the event of litigation.
Ill
¶ 97. This interpretation is supported not only by the text but also by the context in which the fee agreement was executed and operates, namely the Wisconsin lemon law allowing claims for defective cars and Wis. Stat. § 100.18 governing suits for misrepresentation. Words in a contract "are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight."[23]
¶ 98. A car purchase, next to a home purchase, is the largest single expenditure of many people. When a consumer purchases a defective car, the lemon law statutes and Wis. Stat. § 100.18 are designed to give the consumer a remedy. Both statutes are fee-shifting statutes that modify the American rule regarding who pays the attorney.[24] Ordinarily in the United States the *338 prevailing party does not collect attorney fees from the opposing party.[25] Thus plaintiffs in relatively small-dollar-amount consumer cases often cannot afford to seek relief if they have to incur and pay attorney fees. The lemon law and Wis. Stat. § 100.18 address this fact of life [26]
¶ 99. In cases governed by the lemon law and Wis. Stat. § 100.18 (explicitly referenced in the "FEE SHIFTING" provision), payment for the plaintiffs attorney fees shifts from the plaintiff to the defendant.
¶ 100. The legislature has expressed this vital public policy of the state favoring fee shifting in lemon law and misrepresentation cases to ensure the rights of consumers: "Fee-shifting statutes, and the attorneys
who represent clients in such cases, are thus vital to ensuring that the rights of consumers are vindicated in court."[27]
¶ 101. Attorney Megna holds himself out as, and is known as, one of the few attorneys in Wisconsin who takes lemon law cases.[28]
¶ 102. This is the context in which the fee agreement at issue was executed. Indeed, the majority opinion, ¶¶ 26-29, discusses the importance that the legislature has given to the fee-shifting statutes in enforcing the consumer-protection laws at issue in the instant case.
¶ 103. The majority opinion acknowledges, and rightly so, that the defendant should not be able to *339 circumvent the fee-shifting statute’s public policy by cutting attorneys out of their ability to collect attorney's fees through unfettered out-of-court settlement:
While we recognize the important right of a client to settle, if a client has an unfettered right to settle without counsel's involvement when a fee-shifting statute is implicated, otherwise qualified attorneys will be discouraged from practicing in this vitally important area of law.
Majority op., ¶ 29. I agree with the majority opinion's analysis of the legislature's mandated public policy.
¶ 104. Why then does the majority opinion ignore the legislative declaration of public policy in deciding the instant case? The majority opinion does not say.
¶ 105. In sum, when I apply the rules of contract interpretation, I conclude that the text and context of the entire fee agreement demonstrate that the agreement assigned the statutory fees from the client to the attorney in the circumstances listed in the "FEE SHIFTING" provision, namely litigation.
IV
¶ 106. A few other matters regarding contract interpretation emerge in the majority opinion.
¶ 107. In the end, the majority opinion never truly decides whether there are competing reasonable interpretations of the fee agreement requiring a court to look beyond the four corners of the contract to interpret its meaning. Instead, the majority opinion waffles.
¶ 108. On the one hand, the majority opinion can be interpreted as treating the agreement as unambiguous, looking only to the text and never citing any extrinsic evidence to determine the intent of the parties.
*340 ¶ 109. On the other hand, the majority opinion views the fee agreement as potentially "unclear" on the subject of the assignment of attorney's fees. Majority op., ¶ 48.
¶ 110. If the fee agreement is "unclear," the intention of the parties is a question of fact to be determined by the finder of fact after being presented with extrinsic evidence.
¶ 111. I would recognize the fee agreement for what it is, an unambiguous assignment of the right to attorney's fees from Betz to Attorney Megna.
¶ 112. Furthermore, the majority opinion apparently assumes, without discussion, that the fee agreement is an integrated contract.
¶ 113. Yet this contract on its face is not complete and therefore is not fully integrated. There is a blank in the fee agreement that is not filled in. The amount Attorney Megna will charge the client in the "SETTLEMENT PRIOR TO LAWSUIT" provision is left blank.
¶ 114. A blank in a contract on a material matter indicates that the contract is not fully integrated and that extrinsic evidence may be used to understand the intention of the parties.
¶ 115. Rather than looking to extrinsic evidence, as dictated by our rules of contract interpretation for unclear or non-integrated contracts, the majority opinion asserts that the burden is on the attorney "to state clearly the terms of the fee agreement and to address specifically the allocation of court-awarded attorney's fees." Majority op., ¶ 48 (quoting Gorton v. Hostak, Henzl & Pichler, S.C., 217 Wis. 2d 493, 508, 577 N.W.2d 617 (1998) and citing Ziolkowski Patent Solutions Grp., S.C. v. Great Lakes Dart Mfg., Inc., 2011 WI App 11, ¶ 13, 331 Wis. 2d 230, 794 N.W.2d 253).
*341 ¶ 116. In the Gorton case, the fee agreement was a contingent fee agreement. The fee agreement was silent regarding the allocation of reasonable attorney fees under Wis. Stat. § 100.18. Statutory attorney fees were awarded. The Gorton court held that the distribution of the statutory attorney fee award was governed by the contract between the parties.[29] The contingent fee agreement in Gorton did not "address specifically" the allocation of statutory attorney's fees, and the attorney did not receive statutory fees.
¶ 117. In contrast, in the instant case the "FEE SHIFTING" provision does exactly what the fee agreement in Gorton did not do — the fee agreement at issue addresses specifically the allocation of statutory attorney fees.
¶ 118. Furthermore, in Gorton the dispute about who was entitled to the statutory attorney fees pursuant to the fee agreement between the attorney and the client was between the attorney and the client. The attorney and client were adversaries. To the extent that the agreement between the attorney and client in Gorton did not specifically address the allocation of statutory attorney fees, the attorney, who had obviously drafted the agreement and who had legal expertise, lost.
¶ 119. In the instant case, no dispute exists between the attorney (Megna) and the client (Betz) that, pursuant to their fee agreement, the attorney, not the client, has the right to any statutory attorney fees.[30] The dispute in the instant case about who is entitled to statutory attorney fees is between Megna, as Betz's attorney, and Diamond Jim's, as the potential payor of *342 the statutory attorney fees. Thus, the rule stated in Gorton governing interpretation of a fee agreement in a dispute between the attorney and client does not apply in the present case.
¶ 120. The interpretation of the fee agreement proposed by the majority opinion is, unfortunately, troubling on too many different fronts.
¶ 121. For the foregoing reasons, I dissent. I would remand the case to the circuit court to determine whether the defendant had notice of the assignment.
[[Image here]]
*324-A [[Image here]]
*342-B [[Image here]]

 The full text of the majority opinion, ¶ 41, reads as follows:
*326 "An assignment is the 'manifestation of the assignor's intention to transfer' a right so that the assignee acquires the right to performance by the obligor." Stilwell v. Am. Gen. Life Ins. Co., 555 F.3d 572, 577 (7th Cir. 2009) (quoting Restatement (Second) of Contracts § 317 (1981)). "It is essential to an assignment of a right that the obligee manifest an intention to transfer the right to another person without further action or manifestation of intention by the obligee." Restatement (Second) of Contracts § 324 (1981). No such manifestation exists in the fee agreement at issue.

 At the circuit court, the attorney moved to intervene to make a claim against the defendant for tortious interference with the fee agreement. Neither the parties nor I address this issue or any potential claim the attorney may have against the defendant.

 See, e.g., Anthony Gagliano & Co. v. Openfirst, 2014 WI 65, 355 Wis. 2d 258, 850 N.W.2d 845 (disputing whether a transfer of property rights constituted an assignment or a sublease); Dow Family, LLC v. PHH Mortgage Corp., 2014 WI 56, 354 Wis. 2d 796, 848 N.W.2d 728 (disputing whether an assignment of a mortgage deed was valid as to a later purchaser of property); see also Attorney's Title Guaranty Fund v. Town Bank, 2014 WI 63, 355 Wis. 2d 229, 850 N.W.2d 28 (disputing whether the proceeds of a legal malpractice claim could be assigned).

 Restatement (Second) of Contracts § 317 (quoted by majority op., ¶ 41 (emphasis added)).

 See 9 Corbin on Contracts § 47.7, at 147-48 (rev. ed. 2007) ("[I]n the absence of statute or a contract provision to the contrary, there are no prescribed formalities that must be observed to make an effective assignment. It is sufficient if the assignor has, in some fashion, manifested an intention to make a present transfer of his rights to the assignee."). See also Restatement (Second) of Contracts § 2 cmt. b. ("A promisor manifests an *328 intention if he believes or has reason to believe that the promisee will infer that intention from his words or conduct.").

 29 Richard Lord, Williston on Contracts § 74:3 (4th ed. 2003).

 Restatement (Second) of Contracts § 324 (1981) (emphasis added).

 Restatement (Second) of Contracts § 2, cmt. b.

 Sonday v. Dave Kohel Agency, Inc., 2006 WI 92, ¶ 21, 293 Wis. 2d 458, 471, 718 N.W.2d 631 (internal quotation marks & citation omitted).

 Restatement (Second) of Contracts § 202(2).

 Restatement (Second) of Contracts § 202(1).

 Gorton v. Hostak, Henzl & Pichler, S.C., 217 Wis. 2d 493, 505, 577 N.W.2d 617 (1998).

 Restatement (Second) of Contracts § 20, cmt. b.

 See D. Canale & Co. v. Pauly & Pauly Cheese Co., 155 Wis. 541, 145 N.W. 372 (1914) (interpreting a contract's place of performance clause by viewing the acts of the parties "from a common sense standpoint"); Mikula v. Miller Brewing Co., 2005 WI App 92, ¶ 22, 281 Wis. 2d 712, 701 N.W.2d 613 (interpreting an insurance contract using a "common sense" reading of the text).

 See Bradish v. British Am. Assur. Co. of Toronto, Canada, 9 Wis. 2d 601, 604-05, 101 N.W.2d 814 (1960) (interpreting a contract under the more "realistic" connotation of its terms) (citing Travelers Fire Ins. Co. v. Whaley, 272 F.2d 288, 290-91 (10th Cir. 1959)).

 Majority op., ¶ 39 (quoting Town Bank v. City Real Estate Development, LLC, 2010 WI 134, ¶ 33, 330 Wis. 2d 340, 793 N.W.2d 476.

 See Kernz v. J.L. French Corp., 2003 WI App 140, ¶ 10, 266 Wis. 2d 124, 667 N.W.2d 751.

 See, e.g., Yauger v. Skiing Enters., Inc., 206 Wis. 2d 76, 87 & n.2, 557 N.W.2d 60 (1996) (noting that negligence waivers in contracts "should be preceded by a clear, not misleading, heading and should not be written in legal jargon"); Commercial Union Midwest Ins. Co. v. Vorbeck, 2004 WI App 11, ¶¶ 46-49, 269 Wis. 2d 204, 674 N.W.2d 665 (Brown, J., concurring) (deploring the use of jargon in insurance contracts and citing Wis. Stat. § 631.22, which requires that a consumer insurance policy be "written in commonly understood language"); Pietroske, Inc. v. Globalcom, Inc., 2004 WI App 142, ¶ 9, 275 Wis. 2d 444, 685 N.W.2d 884 (noting that whether a contract term or condition is "in plain English" bears on whether it is unconscionable).

 The majority opinion reads at ¶ 42 as follows:
The terms of the fee agreement indicate that Betz understood that "the defendant is usually responsible for paying" attorney's fees in suits under Wis. Stat. § 100.18. The agreement further provided that Betz's attorneys would "look to the defendant for payment of attorney fees pursuant to the fee[-]shifting provision once a lawsuit has been filed." These qualified statements, however, cannot be fairly characterized as a written assignment of Betz's statutory right to recover fees.

 United States v. Collins, 510 F.3d 697, 699 (7th Cir. 2007).

 1 Jay E. Grenig, Wisconsin Legal Forms § 8:24 (updated 2014) (available on Westlaw).
In another recent case, Attorney's Title Guaranty Fund v. Town Bank, 2014 WI 63, 355 Wis. 2d 229, 850 N.W.2d 28, similar assignment language was used after a detailed listing of various legal malpractice claims:
Now therefore, in order to induce [the assignor] to loan [the assignee] $195,000.00, pursuant to the provisions of a certain Mortgage Note . .., [the assignor] hereby assigns and transfers his interest in. . . the proceeds resulting from each of the above described Claims to [the assignee] together with its successors and assigns ....

 The majority opinion reads at ¶ 43 as follows:
The fee agreement further provides for a number of circumstances where Betz might have to pay for Megna's fees or costs himself. For example, if the case had settled prior to the filing of the lawsuit, Betz would have had to pay a flat rate for Megna's fees. Similarly, if Betz had declined to settle the case on terms his attorneys "deemfed] reasonable," he would have had to immediately pay all of Megna's costs up to that point and continue to pay further costs as they become due. Finally, the agreement provided that if either Betz or his attorneys terminated the attorney-client relationship, Betz would he responsible for paying both Megna's fees and costs. These provisions provide evidence that Betz did not assign his right to statutory attorney's fees to Megna in the fee agreement. As a result, traditional principles of contract law militate against finding that Betz assigned his right to statutory attorney's fees to Megna.

 Restatement (Second) of Contracts § 202 (1).

 See Cook v. Pub. Storage, Inc., 2008 WI App 155, ¶ 85, 314 Wis. 2d 426, 761 N.W.2d 645.

 Winkleman v. Beloit Mem'l Hosp., 168 Wis. 2d 12, 28, 483 N.W.2d 211 (1992).

 See majority op., ¶¶ 26-29.

 Majority op., ¶ 28 (emphasis added).

 See majority op., ¶ 29 n.10 ("For example, the record reflects that Megna is one of only a handful of attorneys in Wisconsin who takes automobile consumer rights cases.").

 Gorton, 217 Wis. 2d at 508.

 Megna continues to represent Betz and has averred that he has made no claim and plans to make no claim against his client.